# IN THE COURT OF APPEALS OF IOWA

No. 24-1818
Filed February 19, 2025

IN THE INTEREST OF T.M.-L.,
Minor Child,

A.L., Father,
    Appellant,

S.M., Mother,
    Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Joan M. Black, Judge.

The mother and father separately appeal termination of their parental rights to a child. **AFFIRMED ON BOTH APPEALS.**

Karina A. Miller of Astræa Legal LLC, Iowa City, for appellant father.

Kristin L. Denniger, Mount Vernon, for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Katherine M. Eastvold, North Liberty, attorney and guardian ad litem for minor child.

Considered by Badding, P.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

The mother and father separately appeal termination of their parental rights to a child born in December 2023. After considering the parties' arguments on appeal in light of the record and arguments made below, we affirm.

## I.       Background Facts and Proceedings.

The child at issue in this appeal was born with methamphetamine in her umbilical cord. The child was removed from the mother's custody and placed with a relative when she was just a few days old. The mother consented to removal, and the father—who was incarcerated in a neighboring county jail for violating a no-contact order with the mother as protected party—did not participate in the hearing.

This was not the mother's first encounter with the Iowa Department of Health and Human Services (HHS). She had been repeatedly investigated for abusing her older children. The founded assessments generally related to methamphetamine and other drug use and domestic violence. The mother's criminal history included offenses relating to these problems, theft, assault, probation violations, and escaping custody. Iowa courts have previously terminated the mother's parental rights to four older children. As the juvenile court put it, those other files "address the same concerns" about substance abuse present in this case. And even in the mother's retelling, the terminations related to "unhealthy relationships and substance abuse."

The mother made minimal progress over the life of the case. She engaged with some services in a limited way and attended most visits, though there were concerns she was under the influence of methamphetamine (or coming down from

using) while caring for the child, as evidenced by her falling asleep, seeing imaginary bugs, slurring her speech, and other indicators of use. The HHS worker testified the mother had never provided a negative drug-test result—"Every single test result has been positive for methamphetamine." And one was positive for cocaine. In addition to the positive results, the mother missed about half of her drug-testing appointments, despite the HHS worker going above and beyond to text the mother and remind her about appointments in advance.

Treatment providers recommended inpatient substance-abuse treatment, but the mother was discharged from at least one program due to attendance problems. The provider told HHS that the mother was "in dire need of more mental health and social supports." Yet the mother never successfully completed substance-abuse or mental-health treatment. And she continued to deny methamphetamine use to HHS, blaming other people for exposure. As of trial, she was not in any substance-abuse treatment. And at one point during the case, the mother told a case worker that she would not attempt inpatient treatment unless the court ordered it.

In her trial testimony, the mother said she thought she was working hard to regain custody and blamed her lack of progress in part on what she described as a genetic predisposition toward mental illness. She admitted to abusing controlled substances in the past but denied using in the last two-to-three years. And she disputed the positive HHS drug-test results, claiming the testing staff "lied" and that negative urinalysis from a different provider was more reliable than HHS patches or hair stats. She had no explanation when the court asked her why the child tested positive for methamphetamine at birth, other than speculating about

secondhand exposure. She also disputed whether she had fallen asleep at visits or at trial—despite the HHS worker testifying from the witness stand that she observed the mother fall asleep at trial.

When asked at trial if she thought the child could be returned to her immediate custody, the mother candidly answered: "No, I don't," and explained that she had "a lot of progress to make within myself" regardless of "[w]hether DHS was in my life or not." The juvenile court had concerns about the truthfulness and reliability of the mother's testimony, observing: "At best, [the mother] is a poor historian. At worst, she is dishonest." And the court noted the juvenile courts had expressed similar concerns after the other termination trials, with one judge describing her as "at best, confused and, at worst, disingenuous, and dishonest." In addition to the documented problems in this case, the mother pled the Fifth Amendment when asked about pending forgery and theft charges for which she had just had an initial appearance.

At some point between disposition and the termination trial, the father was moved to a correctional facility in Nebraska subject to an immigration hold. He has never met the child in person but has participated in a few video and phone visits. He sent the child drawings and explained in testimony that he loved her despite never meeting her in-person. The father expressed optimism he may be released after an appeal, but the HHS worker testified she understood from immigration officials that a deportation date was set.

The HHS worker opined that additional time would not make a difference for either of these parents. With regard to the father, his incarceration was indefinite, with no clear date for release or deportation. For the mother, the

worker's view was that the mother "ha[d]n't made any progress since the beginning of the case" and there was no reason to think she would start progressing now.

Since removal, the child has been in the same relative placement and was doing well. Although the record generally indicates the placement is supportive of the mother, the mother never progressed to unsupervised visits or a trial home placement.

The county attorney, HHS, and the child's guardian ad litem all recommended termination of parental rights. The court terminated both parents' rights under Iowa Code section 232.116(1)(h) (2024) and also terminated the mother's rights under section 232.116(1)(g) and (*l*). The parents separately appeal, and we review de novo. *See In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021).

## II.     The Mother's Appeal

The mother raises four claims on appeal, contesting the statutory elements of the grounds for termination, whether termination was in the child's best interests, whether the permissive bond exception should preclude termination, and whether she should have been given additional time to work toward reunification. We consider each claim.

**Statutory Elements.** In her petition on appeal, the mother challenges elements of termination under section 232.116(1)(g), (h), and (*l*). But, when a juvenile court terminates a parent's rights on multiple grounds, we need only find one statutory ground supported by substantial evidence to affirm. *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We choose to focus our review on (h). And the only element of that ground the mother meaningfully contests is whether the child

could be safely returned to her custody as of trial. *See* Iowa Code § 232.116(1)(h)(4); *In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018). We credit the mother's candid admission in sworn testimony that she could not safely take immediate custody of the child. We could summarily affirm on this basis. *See In re D.C.*, No. 24-1792, 2025 WL 401965, at *4 (Iowa Ct. App. Feb. 5, 2025). But we also find the mother's admission below abundantly supported by the record. She had not shown consistent sobriety, adequately engaged with treatment, or progressed to unsupervised visits. *See In re L.H.*, 13 N.W.3d 627, 629 (Iowa Ct. App. 2024) (affirming juvenile court's finding that unaddressed substance-abuse problems and a failure to progress beyond supervised visits rendered the parent unable to safely resume custody as of trial). Contrary to the mother's attempts at downplaying or minimizing it, we recognize methamphetamine is a particularly pernicious controlled substance, and controlling case law recognizes the hazard a caregiver's addiction to methamphetamine poses to children in an addict's care. *A.B.*, 815 N.W.2d at 776; *see State v. Petithory*, 702 N.W.2d 854, 859 (Iowa 2005). The mother had not seriously acknowledged her addiction, let alone resolved it. The child could not be safely returned to her. *See In re J.P.*, No. 19-1633, 2020 WL 110425, at *2 (Iowa Ct. App. Jan. 9, 2020) (concluding that a child couldn't be returned to the parent's care because the parent's "relationship with methamphetamine" was not over). We affirm the juvenile court's analysis of section 231.116(1)(h).

**Best Interests.** The mother next challenges whether it was in the child's best interests to terminate the mother's parental rights. Under our statutory framework, we primarily weigh "the child's safety, . . . the best placement for

furthering the long-term nurturing and growth of the child, and . . . the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). On this question, we are mindful that "we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010). We agree with the juvenile court that the mother cannot provide a safe and sober home for the child and that the child deserves permanency. Termination is in the child's best interests.

**Permissive Bond Exception.** Arguably, the mother also advances the permissive bond exception on appeal. The juvenile court may decline termination if it "would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). A parent resisting termination has the burden to prove this permissive exception by clear and convincing evidence, and our case law recognizes that—without more—neither a parent's love nor the mere existence of a bond is enough to prevent termination. *See A.S.*, 906 N.W.2d at 476; *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010). Like the juvenile court, we conclude any bond between the mother and child does not outweigh the need for permanency and the child's need for a safe and sober home. *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (noting we consider the bond in the context of a case's unique circumstances and the children's best interests). The mother has not carried her burden to thwart termination on this basis.

**Additional Time.** Last, the mother urges the juvenile court should have afforded her an additional six months of time to work toward reunification. "[T]he

juvenile court may deny termination and give the parent an additional six months for reunification only if the need for removal 'will no longer exist at the end of the additional six-month period.'" *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (quoting Iowa Code § 232.104(2)(b)). And the parent bears the burden to make that showing. *Id.* at 322–24. The mother did not carry her burden here. We agree with the juvenile court and the HHS worker that the mother made virtually no progress over the life of the case and there is no reason to think that the need for removal—specifically the danger posed by mother's methamphetamine addiction—would be resolved within six months. As our court has observed before, "The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems." *In re D.A.*, 506 N.W.2d 478, 479 (Iowa Ct. App. 1993) (citation omitted).

### III.    The Father's Appeal

Like the mother, the father raises multiple claims on appeal, challenging the statutory elements, best interests, and the permissive bond exception, as well as requests for a guardianship and additional time. We again consider each, noting where the analysis touches on our conclusions regarding the mother's appeal.

**Statutory Elements.**  At trial, the father conceded "the court has grounds to terminate under the code section." This waives any challenge to the statutory elements or otherwise permits us to summarily affirm on this issue. *See, e.g.*, *Jasper v. State*, 477 N.W.2d 852, 856 (Iowa 1991) (noting one "cannot deliberately act so as to invite error and then object because the court has accepted the invitation"); *McCracken v. Edward D. Jones & Co.*, 445 N.W.2d 375, 378 (Iowa Ct. App. 1989) ("[I]t is elementary a litigant cannot complain of error which he has

invited . . . ."); *D.C.*, 2025 WL 401965, at \*4.  But we note, in the interests of completeness, we would affirm if the merits were properly before us.  As of trial, the father was incarcerated for an indefinite period of time, subject to an immigration hold.  Obviously the child could not be safely returned to his immediate custody.  *See A.S.*, 906 N.W.2d at 473.

**Best Interests.**  The father also contests whether termination is in the child's best interests.  We evaluate his claim under the same statutory framework as we did the mother's.  *See* Iowa Code § 232.116(2); *P.L.*, 778 N.W.2d at 41.  And we come to the same conclusion as we did on the mother's claim: termination is in the best interests of the child.  The father has been incarcerated the entirety of the child's life and cannot care for her or resume custody now or at any definite time in the future.

**Permissive Bond Exception.**  The father also asserts the permissive bond exception should have thwarted termination.  *See* Iowa Code § 232.116(3)(c).  We assume without deciding the father preserved error on this claim.  And we reject it on the merits.  While the father made clear he loves the child, he has never met her in-person and only had a limited number of video visits.  Assuming without deciding the father carried his burden to prove by clear and convincing evidence there was a bond, we find neither the bond nor his love for the child outweigh the child's need for a safe, sober, and stable home—particularly when compared to the indefinite nature of the father's incarceration and possible deportation.  *See A.S.*, 906 N.W.2d at 476; *D.W.*, 791 N.W.2d at 709.

**Guardianship.**  On appeal, the father asserts that, rather than terminate his rights, the court could have placed the child in a guardianship.  But the father did

not make this request below. We are a court for correction of errors at law—not a court that ordinarily decides claims in the first instance. *See* Iowa Code § 602.5103(1). We do not reach this unpreserved claim. *See In re J.R.*, ___ N.W.3d ___, ___, 2025 WL 52738, at *1–2 (Iowa Ct. App. 2025) (en banc) (requiring error-preservation for this step of the termination process).

**Additional Time.** Last, the father asks for an additional six months to work toward reunification. We affirm the juvenile court, as there is no reason to think the father will be available to safely take custody after an additional six months. *See W.T.*, 967 N.W.2d at 323.

**AFFIRMED ON BOTH APPEALS.**